**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 10, 2014**

# In the Court of Appeals of Georgia

A14A0121. PATTERSON v. THE STATE.

McMILLIAN, Judge.

Danny Gary Patterson appeals following the denial of his motion for new trial after a jury convicted him of one count of distribution of methamphetamine, one count of possession of hydrocodone, and one count of possession of marijuana. For the reasons set forth below, we affirm his convictions for possession of methamphetamine and marijuana, but reverse his conviction for possession of hydrocodone.

Viewed in the light most favorable to the verdict, the evidence shows that in or about January 2010, Darcy Bennett began working as a confidential informant with

Agent William Patterson,[1] who was employed by the Towns County Sheriff's Office and attached to the Appalachian Drug Task Force.[2] Agent Patterson and Bennett initially targeted Michael Goode, Patterson's co-indictee, as the object of their investigation. The intent was to have Bennett make multiple controlled drug buys from Goode to confirm what she had told the agent about the variety of drugs Goode was selling. In that regard, Bennett went to Goode's home in a Union County trailer park on February 9, 2010. Bennett was able to purchase two types of prescription pills and marijuana from him on that date.

She returned to Goode's house on February 22, 2010, to again purchase pills and marijuana, but when she got there, he did not have any marijuana. Instead, he offered to procure some methamphetamine from Patterson. He then twice called Patterson's phone number to discuss a transaction.[3] Although Goode's memory was

---

[1] Although they share the same last name, William Patterson apparently is not related to the defendant in this case. To distinguish between the two, we will refer to William Patterson as "Agent Patterson" and Appellant Patterson as simply "Patterson."

[2] The task force is a multi-jurisdictional law enforcement agency, overseen by the Georgia Bureau of Investigation, with the primary focus of prosecuting illegal drug activity. The counties involved are Towns, Union, Lumpkin and White.

[3] The parties stipulated to the admission of the phone records from Patterson's phone number, which show that his phone received two calls from the same number

sketchy, he recalled leaving his trailer and walking to Patterson's trailer to get the drugs. Bennett watched him walk around the trailer next door in the direction where Goode had indicated Patterson's trailer was located. He returned with the methamphetamine. On that occasion, Bennett was able to purchase fifteen and one-half small pills of diazepam and two "little corner baggies" of methamphetamine.

Later, Bennett used Patterson's phone number, which she had obtained from Goode, to call Patterson on two occasions in an attempt to set up a direct buy of methamphetamine from him, but her attempts were unsuccessful.

Police subsequently arrested Patterson on the methamphetamine charge and executed a search warrant on his home. During the search, police discovered a marijuana grinder, a small tray with loose marijuana and rolling papers, a pipe with the smell of burnt marijuana, and a small oval, white pill, which was sitting on his kitchen counter and which was later identified as hydrocodone. Patterson admitted at trial that he used the pipe for smoking marijuana and that he had marijuana in the house at the time of his arrest, but he testified that he had never seen the pill the

---

on February 22, 2010 at 11:16 a.m. and 2:25 p.m. The first call lasted approximately two minutes and the second call lasted over three minutes.

police found at his house before he swept it out from under his computer desk, picked it up and put it on his counter, thinking it might belong to his mother.

Patterson's mother testified that her doctor had prescribed Lortab for her in March 2010 when she broke her hip. During her recuperation, she stayed at Patterson's house for a week or so in the month before he was arrested. She testified that it was possible that she dropped some of her pills because she was unsteady on her walker, although she could not state with certainty that she had done so. Although she recalled that the medication looked like little capsules and the State raised some question as to whether she even would have had those pills when she stayed with Patterson, Patterson's sister testified that the Lortabs[4] were oval, white pills and that her mother had those pills at Patterson's house.

At trial, Patterson denied that Goode came to his house on February 22, 2010, because he recalled that he was working that day, although he admitted that Goode could have come to his house any day before that. He also denied that he sold any methamphetamine to Goode, or that he had ever seen the methamphetamine in the

---

[4] We could locate no direct evidence in the record demonstrating that Lortabs or any of Patterson's mother's other prescriptions contain hydrocodone, although the Lortab prescription bottle introduced at trial read that it was for "41 Hydroco/Apap 7.500 Tab Malc."

4

"little corner baggies" introduced at trial. However, he admitted that he previously had used methamphetamine and that he had three prior felony convictions, one of which was for possession of methamphetamine.[5]

On appeal, Patterson asserts that (1) the trial court committed plain error when it "intimidated and threatened [Goode] with a very harsh sentence unless [Goode] testified against [the] defendant in the way the government wanted him to testify;" (2) the trial court "allowed the jury to believe that Mr. Goode was not getting a benefit for his agreement to testify against Mr. Patterson at trial;" (3) the trial court committed plain error when it failed to properly instruct the jury on the issue of possession; (4) his trial counsel was ineffective with regard to presenting the issues regarding the trial court's alleged intimidation of Goode and with regard to the jury charges; and (5) the trial court erred when it failed to grant a new trial based on the jury foreperson's testimony that he observed Patterson in custody during a trial recess.

---

[5] Although Patterson does not contest the sufficiency of the evidence to support his convictions, we find the evidence at trial, although contested, was sufficient to support his convictions beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

1. Patterson asserts the trial court committed plain error in intimidating Goode into testifying against Patterson. Two months before Patterson's trial, Goode pled guilty to the charges filed against him arising out of these incidents. Patterson asserts that during Goode's plea hearing, the trial judge, who was the same judge who presided over Patterson's trial, directly and forcefully interjected himself into the plea process by asking Goode why he should accept his plea deal and not reject it "until [Goode's] memory gets a little better on [the events of February 22, 2010]," noting that he could sentence Goode to a maximum of 70 years.

During her cross-examination of Goode, Patterson's defense counsel questioned him regarding specific questions asked at his plea hearing and his responses. Therefore, she presumably had a transcript of that hearing, but at no time did she raise the issue of any alleged impropriety by the trial court with regard to Goode's testimony. In fact, during a colloquy between counsel and the trial court regarding Goode's plea hearing, the prosecutor referenced the fact that "at some point, the Court challenged Mr. Goode during his plea and suggested the Court wouldn't take his plea if he didn't remember what he was guilty of," and Patterson's attorney responded, "I'm not going there."

In order to raise on appeal an impropriety regarding the admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and the failure to do so amounts to a waiver of that specific ground. . . . Despite his waiver, [Patterson] contends that the [trial court committed] plain error. But that doctrine is currently limited to alleged error in three circumstances: the sentencing phase of a trial resulting in the death penalty, a trial judge's expression of opinion in violation of OCGA § 17-8-57, and a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b).

(Citations omitted.) *Carter v. State*, 321 Ga. App. 877, 879 (1) (743 SE2d 538) (2013). Accordingly, this issue is not subject to plain error review.

And to the extent that Patterson is claiming error in the trial court's actions in Goode's case, and not in his own, Patterson lacks standing to assert any such error. See *Waugh v. State*, 263 Ga. 692, 696 (15) (437 SE2d 297) (1993) (appellant had no standing to complain that the trial court accepted his codefendant's guilty plea); *Sims v. State*, 243 Ga. 83, 85 (2) (252 SE2d 501) (1979) ("A party will not be heard to complain of the violation of another person's constitutional rights."); *Jackson v. State*, 156 Ga. App. 280 (4) (274 SE2d 674) (1980) ("Appellant has no standing to complain of the trial court's refusal to accept his codefendant's guilty plea.").

2. Patterson also argues that the trial court allowed the jury to believe that Goode did not get any benefit for his testimony. Patterson asserts that Goode benefitted because his plea deal was accepted after the trial court allegedly intimidated him into remembering the events of February 22. But Patterson has failed to identify any objection or motion by counsel or any ruling by the trial court addressing this issue before or during trial.[6] It is well settled that "this is a court for correction of errors of law committed by the trial court where proper exception is taken, because one may not abandon an issue in the trial court and on appeal raise questions or issues neither raised nor ruled on by the trial court." (Citations omitted.) *Williams v. State*, 326 Ga. App. 665, 670 (4) (757 SE2d 267) (2014).

Nevertheless, we will address this issue to the extent it arises in the context of Patterson's claim for ineffective assistance of counsel.

3. Patterson asserts that his trial counsel was deficient in failing to raise the issues regarding this alleged intimidation and the resulting benefit to Goode of having his plea accepted.[7]

---

[6] Instead, he cites to the previously referenced colloquy between the trial court and counsel.

[7] By the time of the hearing on the motion for new trial, the trial judge apparently had resigned, and the motion was heard by a different judge. Although

8

The two-prong test for determining the validity of a claim of ineffective assistance of counsel provided in *Strickland v. Washington,* 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's deficiency.

(Citation omitted.) *Miller v. State*, 271 Ga. App. 524, 525-526 (3) (610 SE2d 156) (2005). "Since an appellant claiming ineffective assistance of counsel must show both deficient performance and actual prejudice stemming from that deficiency, an insufficient showing on either of these prongs relieves the reviewing court of the need to address the other prong." (Citation and punctuation omitted.) *Riggins v. State*, 279 Ga. 407, 409 (2) (614 SE2d 70) (2005).

---

Patterson raised a claim of ineffectiveness of counsel on this ground in his hearing brief and, to some extent, in argument, the new judge did not expressly rule on that claim of ineffectiveness. Rather, the judge noted that neither side called Goode as a witness at the motion hearing, although the transcript of his plea hearing was admitted, and the judge found that "[t]here is no evidence that the [trial judge] intimidated the witness." Although the hearing judge may have determined that this finding obviated any need to address the ineffectiveness claim on this issue, the finding of no intimidation effectively denied that claim. And because we have found that the issue of intimidation is not directly before us, we consider the events at Goode's plea hearing only in the context of Patterson's claim of ineffectiveness of counsel.

"To prove deficient performance, [an appellant] must show that his lawyer performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State,* 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). Moreover, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "Thus, a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted.) *Brown v. State*, 288 Ga. 902, 909 (5) (708 SE2d 294) (2011).

Patterson asserts that his trial attorney erred in not addressing the trial court's alleged intimidation of Goode at his plea hearing and in not cross-examining Goode on his denial that he received any benefit for such testimony. But it is well settled that decisions about cross-examination and how to discredit a witness are matters of trial strategy. *Payne v. State*, 289 Ga. 691, 697 (3) (b) (715 SE2d 104) (2011) ("[d]ecisions about what questions to ask on cross-examination are quintessential trial strategy"); *Washington v. State*, 276 Ga. 655, 659 (3) (a) (581 SE2d 518) (2003) ("The manner in which an attorney attacks the credibility of a witness falls within the ambit of trial

tactics."); *Pickard v. State*, 302 Ga. App. 483, 487 (1) (b) (i) (691 SE2d 569) (2010) ("The manner in which an attorney chooses to attack a witness'[s] credibility falls within the ambit of trial tactics.").

Here, it is apparent that Patterson's trial attorney made a conscious decision not to address these issues as she expressly stated that she was "not going there" when the prosecutor mentioned the trial court's role in Goode's plea hearing. Patterson did not call his trial counsel to testify at the motion for new trial hearing, and without such testimony, the record contains no evidence as to why his trial attorney made this decision. The presumption of reasonable trial strategy is "extremely difficult to overcome when the defendant fails to call the trial attorney to testify on the motion for new trial." (Citation and punctuation omitted.) *Boykin v. State,* 264 Ga. App. 836, 841 (5) (592 SE2d 426) (2003). Moreover, as previously noted, Patterson's trial attorney attacked Goode's credibility by questioning him about his testimony at the plea hearing that he could not remember the events of February 22, including his purchase of methamphetamine from Patterson that day; about other inconsistencies between his statements from the plea hearing and at trial; about Goode's drug use on February 22; and about the overall reliability of his memory of that day.

Under these circumstances, we find that Patterson has failed to overcome the strong presumption that counsel's actions fell within the range of reasonable professional services.

4. Additionally, Patterson asserts that the trial court erred in instructing the jury on the charge of possession of hydrocodone under OCGA § 16-13-30 (a). He asserts that the trial court should have instructed the jury in accordance with the law as clarified by our Supreme Court in *Duvall v. State*, 289 Ga. 540 (712 SE2d 850) (2011) ("*Duvall II*") with regard to the intent required for that crime, and his attorney should have objected to the trial court's improper charge.

In *Duvall II*, the Supreme Court took certiorari on the issue of whether this Court erred "in construing OCGA § 16-13-30 (a) not to require the defendant to know that the pills he possessed were a controlled substance." 289 Ga. at 541. See also *Duvall v. State*, 305 Ga. App. 545 (699 SE2d 761) (2010) ("*Duvall I*"). In that case, police found three loose tablets of a controlled substance in Duvall's pockets during a search incident to his arrest on misdemeanor charges. He was subsequently charged, inter alia, with felony possession of a controlled substance (Zolpidem Tartrate). Id. As more fully explained in this Court's opinion in the case, Duvall admitted at trial that

12

he was drunk and that he had willingly received the pills from his aunt (for whom they were prescribed) earlier in the evening [of his arrest], with her telling him to take the pills for sleeping. He testified that he did not know the pills were a controlled substance and that he thought they were an over-the-counter medication, which testimony constituted his primary defense at trial. *Duvall I*, 305 Ga. App. at 545.

On appeal, he asserted that the trial court erred in failing to give his requested charge on mistake of fact in support of his defense. *Duvall I*, 305 Ga. App. at 547 (2). The Supreme Court agreed with Duvall, holding that

> Possession of a controlled substance is not a strict liability offense. *Here, the criminal intent required by OCGA §§ 16-13-30 (a) . . . is intent to possess a drug with knowledge of the chemical identity of that drug.* The actus reus in [this statute] is possession of the drug, which one knows oneself to possess, when that drug is a controlled substance . . . . Therefore, possessing Zolpidem Tartrate, which one knows or understands to be Zolpidem Tartrate, is a violation of OCGA § 16-13-30 (a) because Zolpidem Tartrate is a controlled substance. On the other hand, possessing Zolpidem Tartrate, which one believes or understands to be an over-the-counter medication (such as Doxylamine Succinate, sold as an over-the-counter sleep aid under the brand name Unisom), is not a crime because the requisite mens rea is not present.

(Emphasis supplied.) *Duvall II*, 289 Ga. at 542. The Supreme Court held that Duvall's "knowledge of the chemical identity of the substance in his possession is purely a

13

question of fact," and the trial court thus erred in denying his request for an instruction on the defense of mistake of fact, reversing this Court's opinion in *Duvall I*. Id.

Here, Patterson's defense to the charge of possessing hydrocodone, as argued by his trial counsel in closing, was that he did not know that the pill found in his apartment contained hydrocodone, and because he lacked that knowledge, he could not be guilty of possessing a controlled substance in violation of the law. Thus, he was not asserting a defense of mistake of fact as in *Duvall*; instead, he was asserting, as his sole argument to rebut the hydrocodone charge, that he lacked the necessary intent, or mens rea, to commit the crime. But the trial court failed to charge on the intent required to prove a violation of OCGA § 16-13-30 (a).

Because Patterson's counsel failed to request such instructions or to object to the trial court's jury instructions as given, we review the trial court's jury charge for plain error. *State v. Kelly*, 290 Ga. 29, 31 (1) (718 SE2d 232) (2011); *Ogletree v. State*, 322 Ga. App. 103, 109 (2) (744 SE2d 96) (2013). "In *Kelly,* [our Supreme Court] adopted the federal definition of plain error from *United States v. Olano,* 507 U.S. 725 (II) (113 [SCt] 1770, 123 LE2d 508) (1993) as well as its four-pronged test."

14

*Guajardo v. State*, 290 Ga. 172, 175-176 (4) (718 SE2d 292) (2011). That test, as set out in *Kelly*, provides:

> First, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation, punctuation, and emphasis omitted.) 290 Ga. at 33 (2) (a). The Supreme Court has noted that the test can be succinctly summarized in this context as "stating that the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceeding." Citation and punctuation omitted.) *Guajardo*, 290 Ga. at 176 (4) (citing with approval, *Wagner v. State,* 311 Ga. App. 589, 593 (716 SE2d 633) (2011) (Blackwell, J., concurring specially)).

15

Applying this standard to the jury charge in this case, we must read and consider the jury charges as a whole in determining whether they contain plain error. *Guajardo*, 290 Ga. at 176 (4). The trial judge charged the jury on the presumption of innocence; the State's burden to prove the crimes beyond a reasonable doubt; the defendant's lack of any burden; the definition of reasonable doubt; the definition and nature of evidence, both circumstantial and direct; expert testimony; credibility; impeachment; inconsistent statements; the requirement of corroboration of an accomplice's testimony with regard to the distribution charge; party to a crime; the required element of venue; the jury's duties with regard to reaching verdict and selecting a foreman; the requirement of a unanimous verdict; and the trial court's lack of intention to express any opinion on the case through its rulings or comment.

Additionally, the trial court charged the jury as to the element of intent in criminal offenses, as follows:

> This defendant is charged with a crime against the laws of the state. A crime is a violation of a statute of the state in which there's a joint operation of an act and intention.

> Intent is an essential element of any crime and must be proven by the State beyond a reasonable doubt. Intent may be shown in a number of ways provided that you, the jury, believe that it existed from the proven

16

facts before you. It may be inferred from the proven circumstances or by the act and conduct or it may in your discretion be inferred when it is a natural and necessary consequence of an act. Whether or not you draw such an inference is a matter solely for you in your discretion.

Criminal intent does not mean an intent to violate the law or a penal statute, but means simply to intend to commit an act that is prohibited by a statute.

This defendant will not be presumed to have acted with criminal intent, but you may find such intention or the absence of it upon a consideration of the words, conduct, demeanor, motive or other circumstances connected with the act for which the accused is being prosecuted.

The trial court further instructed the jury on the elements of each offense. With regard to the possession of hydrocodone, the trial court charged:

In connection with Count 6, I instruct you that it is unlawful for any person to possess a controlled substance and I instruct you that hydrocodone is a controlled substance.

We find the trial court's jury charge to be error in light of evidence presented at trial and the Supreme Court's holding in *Duvall II*. Patterson produced at least some evidence that the pill at issue belonged to his mother and that he did not know that it contained hydrocodone. Under the charge as given, however, the jury could

17

have convicted Patterson of possession of hydrocodone based solely on a finding that he intended to possess the pill, without making a finding regarding his knowledge that the pill contained hydrocodone. Moreover, we find this error to be "an obvious defect rather than a merely arguable defect." *Terry v. State*, 291 Ga. 508, 509 (2) (731 SE2d 669) (2012). Although the holding in *Duvall II* is the first clear expression that OCGA § 16-13-30 (a) requires knowledge of the chemical identity of the controlled substance, Georgia courts previously have imposed the requirement under this statute that a defendant have knowledge that he is possessing contraband. See *Clewis v. State*, 293 Ga. App. 412, 413 (1) (667 SE2d 158) (2008); *Luke v. State*, 230 Ga. App. 712, 714 (3) (497 SE2d 376) (1998), overruling on other grounds recognized, *Fuller v. State*, 235 Ga. App. 436, 438 (2) (509 SE2d 79) (1998); *Smith v. State*, 197 Ga. App. 609, 611 (398 SE2d 858) (1990).

Additionally, we conclude that this erroneous charge affected Patterson's substantial rights and likely contributed to the outcome of the case, in that it allowed the jury to convict him under OCGA § 16-13-30 (a) without consideration of one of the essential elements of the crime. In fact, in closing argument, the prosecutor expressly argued that it did not matter whether Patterson knew the pill contained hydrocodone, stating,

18

You're not going to hear the judge charge you that he had to know [the] chemical makeup [of the pill]. He's going to tell you that he had to be knowingly in possession of hydrocodone. It's the fact that it is hydrocodone that we have to prove [to] you, not that he knew it was hydrocodone, but that he was knowingly in possession of it.

This misstatement of the law was compounded by the judge's failure to charge the jury on possession (i.e., that possession under OCGA § 16-13-30 (a) had to be knowing).[8]

And because we find that the erroneous charge seriously affected the fairness of Patterson's trial with regard to the charge of possession of hydrocodone under

---

[8] For example, the pattern jury charges on possession provides, "The law recognizes two kinds of possession: actual possession and constructive possession. A person who *knowingly* has direct physical control over a thing at a given time is in actual possession of it. A person who, though not in actual possession, *knowingly* has both the power and the intention at a given time to exercise authority or control over a thing is in constructive possession of it." (Emphasis supplied.) Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2013) § 2.76.10.

OCGA § 16-13-30 (a), we exercise our discretion[9] to reverse his conviction on that charge.[10]

5. Patterson further contends that the trial court erred in failing to grant him a new trial based on evidence that the jury foreman saw him in custody during a break in the trial. Patterson's attorney first brought this issue to the trial court's attention at

_____

[9] We note that even prior to the implementation of the plain error test in *Kelly*, Georgia's appellate courts found that trial courts committed reversible error in failing to charge on a defendant's sole defense, even in the absence of a request for such a charge, where, as here, a question of fact is presented on that defense. See, e.g., *Tarvestad v. State*, 261 Ga. 605, 606 (409 SE2d 513) (1991) (failure to give charge on defendant's sole defense of justification was reversible error); *Pollard v. State*, 236 Ga. 587, 589 (4) (224 SE2d 420) (1976) (failure to give charge on sole defense of alibi was reversible error even in the absence of a request for such a charge); *Cadle v. State*, 271 Ga. App. 595, 596 (1) ( 610 SE2d 574) (2005) ("It is well settled in this State that the failure to give a charge on a defendant's sole defense in a criminal case, even without a request, constitutes reversible error if there is some evidence to support the charge.") (citation and punctuation omitted); *Bryan v. State*, 157 Ga. App. 635, 636 (3) (278 SE2d 177) (1981) (reversal required where trial court failed to charge on specific exemption to OCGA § 16-13-30 (a) where defendant presented sufficient evidence to raise a question of fact on the issue of whether he had a prescription for the controlled substance). Even if an assertion of lack of mens rea may not technically be considered a "defense," the trial court's charge in this case did not allow the jury to consider Patterson's argument that the State failed to prove its case, and thus was fundamentally unfair.

[10] And because we have reversed Patterson's possession of hydrocodone conviction on the ground of plain error, we need not address his argument that his trial attorney was ineffective in failing to object to the charge as given or to request a proper charge on that count.

his sentencing hearing, over one month after his trial concluded. The trial court declined to rule on the issue at that time, and Patterson reasserted the issue in his motion for new trial.

The jury foreman testified at the hearing on that motion. He stated that during a break in the proceedings, he went to the jail to be fingerprinted in connection with his application for a weapons permit. He was escorted to the fingerprint area, which he described as an open area with a glass wall separating it from another area. While he was being fingerprinted, he saw Patterson for approximately five seconds behind the glass wall, wearing "regular street clothes." He was not handcuffed or shackled in any way. When Patterson saw the foreman, he waved. In response, the foreman immediately turned around and faced the other direction because he did not want Patterson to think he "was going to befriend him or anything like that."

The foreman said that he did not think anything about the encounter, nor did he form any kind of opinion as to Patterson's guilt or innocence from this encounter because he "always assumed in most cases that the defendant is automatically incarcerated." The foreman did not mention the incident to anyone involved in the trial, nor did he bring it up in the jury room. The encounter did not color his arguments during deliberation, nor did it impact his oath as a juror to seek the truth

from the evidence in the courtroom; rather, he based his decision only on the evidence he heard in the courtroom and the law given by the trial judge. Given this testimony, even Patterson's attorney stated at the hearing on the motion for new trial that it probably does not rise "to the point of being a fundamental and significant error that reaches due process proportions," although he thought it *might* considering "the total circumstances," which he failed to define.

We find the case of *Page v. State*, 250 Ga. App. 494 (552 SE2d 99) (2001), to be persuasive on this point. There,

> [a]fter being sentenced, Page informed the trial court that he felt his case was "tainted" because "one of the jurors in the back may have seen me come from the back[, where the holding cell was located,] with my attorney." The trial court pointed out that the person had been a prospective juror and that Page had not been in "jail clothes" or in handcuffs. The court noted for the record that while Page may have been seen coming from the holding area, "it's a wooden, brown door and there's nothing about it that identifies it as a holding area." Page admitted that neither he nor his lawyer had requested that anyone be questioned about the issue prior to the conclusion of voir dire. Page cannot now complain about what he failed to timely raise to the trial court.

(Citation omitted.) Id. at 497 (4).

Similarly, in this instance, the foreman saw Patterson in street clothes, with no restraints, behind a glass wall. Although this sighting reinforced the juror's pre-existing assumption that most defendants are incarcerated, the foreman did not discuss this sighting with any other jurors, and he testified that it did not affect his decision-making process in any way. Moreover, although Patterson was aware of this interaction during his trial, he did not bring it to the trial court's attention until almost one month later at sentencing. We find no error in the trial court's denial of Patterson's motion for new trial on this ground. See *Elliott v. State*, 253 Ga. 417, 421-422 (5) (320 SE2d 361) (1984) (where each of the four jurors who inadvertently saw the defendant in handcuffs stated that they neither discussed the incident with any other juror nor allowed it to affect their decision, trial court did not abuse its discretion in denying mistrial); *Neal v. State*, 264 Ga. App. 311, 314 (3) (590 SE2d 168) (2003) (viewing of a defendant in shackles by a juror does not, in and of itself, require the trial court to declare a mistrial); *Sweeder v. State*, 246 Ga. App. 557, 561 (3) (541 SE2d 414) (2000) (juror's observation of defendant in shackles and handcuffs did not warrant dismissal of juror who testified that it would not affect him); *Gann v. State*, 245 Ga. App. 448, 448 (1) (538 SE2d 97) (2000) (no error for

23

trial court's failure to act in response to jury's observation of defendant in handcuffs where counsel failed to ask for specific relief).

*Judgment affirmed in part and reversed in part. Phipps, C. J., and Ellington, P. J., concur.*